**FILED**

SEP 1 9 2013

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

| | |
|---|---|
| UNITED STATES OF AMERICA, | Civil Action No.: 1:13-cv-444 |
| Plaintiff, | |
| v. | Judge: Hon. Emmet Sullivan |
| ECOLAB INC., and PERMIAN MUD SERVICE, INC., | |
| Defendants. | |

## FINAL JUDGMENT

WHEREAS, Plaintiff, United States of America, filed its Complaint on April 8, 2013, the United States and Defendants, Defendant Ecolab Inc. ("Ecolab") and Defendant Permian Mud Service, Inc. ("Permian"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by Defendants to assure that competition is not substantially lessened;

AND WHEREAS, the United States requires Defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

1

AND WHEREAS, Defendants have represented to the United States that the divestitures required below can and will be made and that Defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED, AND DECREED:

## I.  JURISDICTION

This Court has jurisdiction over the subject matter of and each of the parties to this action.  The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II.  DEFINITIONS

As used in this Final Judgment:

A.      "Acquirer" means Clariant, the entity to which Defendants shall divest the Divestiture Assets.

B.      "AKA" means a Production Chemical that has an identical formulation or chemical makeup as a Champion Deepwater Production Chemical but has a different SKU or product name.

C.      "Call-off Agreement" means an agreement to provide production chemical management services for a particular asset, geographic region, or time period for a customer with whom the supplier has a Master Service Agreement in place.

D.      "Broussard Facility" means Champion's facility and other assets located at 304 Ida Rd., Broussard, Louisiana 70518.

2

E.      "Champion" means Champion Technologies, Inc., a Texas corporation with its headquarters in Houston, Texas, its successors, assigns, subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

F.      "Champion Deepwater Gulf PCMS Customer" means any entity to which Champion provided PCMS in the Deepwater Gulf at any time between January 1, 2011 and the date the divestitures contemplated by this Final Judgment are completed.

G.      "Champion Deepwater Gulf Production Chemical" means any Production Chemical used to treat an oil or gas producing well in the Deepwater Gulf, including, but not limited to, HI43 and those chemicals listed in Schedule A, and all related tangible and intangible assets.

H.      "Clariant" means Clariant Corporation, the legal U.S. affiliate of Clariant International Ltd., headquartered in Charlotte, North Carolina, its successors, assigns, subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

I.      "Customer-Facing Relevant Employee" means any employee who visits a Champion Deepwater Customer's Deepwater Gulf well or platform to provide PCMS, Relevant Employees who do not visit the Deepwater Gulf well or platform but directly supervise employees who do, or Relevant Employees who regularly interact with Champion Deepwater Gulf Customers but do not visit the customer's Deepwater Gulf wells or platforms on a regular basis.

J.      "Deepwater Gulf" means the areas of the United States Gulf of Mexico that have water depths exceeding 1,000 feet.

3

K.     "Deepwater Gulf Well or Platform" means a well, cluster of wells, or production facility associated with a well found in the Deepwater Gulf.

L.     "Divestiture Assets" means:

(1)     HI43 and all related Intellectual Property Rights;

(2)     Exclusive, perpetual, paid-up, non-transferable licenses for use in the Deepwater Gulf to all Intellectual Property Rights related to Champion's provision of Deepwater Gulf PCMS and Champion Deepwater Gulf Production Chemicals that Champion has provided to a Deepwater Gulf PCMS Customer since January 1, 2012 for use in the Deepwater Gulf and any AKAs of such products. Such licenses will not be subject to any requirement to grant back to the Defendants any improvements or modifications made to these assets;

(3)     All Intangible Assets, excluding Intellectual Property Rights, related to Champion's provision of Deepwater Gulf PCMS;

(4)     The option to acquire the Broussard Facility and all tangible and intangible assets used by or located at the Broussard Facility that are used to design, develop, manufacture, market, service, package, filter, blend, distribute, or test Deepwater Gulf Production Chemicals or provide PCMS to Champion Deepwater Gulf PCMS Customers;

(5)     The option to acquire the Deepwater Gulf Production Chemical Equipment listed in Schedule B, delivered to the Broussard Facility or to a U.S. location specified by the Acquirer; and

(6)     For each Champion Deepwater PCMS Customer who elects to transition its contract or business to the Acquirer, the option to acquire the tangible assets maintained by Champion for the purpose of providing PCMS at that Deepwater Gulf PCMS Customer's Deepwater Gulf Well(s) or Platform(s).

4

M.    "Ecolab" means Ecolab Inc., a Delaware corporation with its headquarters in St. Paul, MN, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

N.    "Gulf" means the United States Gulf of Mexico.

O.    "HI43" means Champion's low dose hydrate inhibitor Production Chemical claimed in U.S. Patent No. 7,381,689 and any reissue (and any foreign counterparts).

P.    "Intangible Assets" means:

(1)    know-how, including, but not limited to, recipes, formulas, machine settings, drawings, blueprints, designs, design protocols, standards, design tools, simulation capability, specifications, and application, manufacturing, blending, filtration, and testing techniques or processes;

(2)    confidential information or any information that provides an advantage with respect to competitors by virtue of not being known by those competitors, including strategic information, business plans, contract terms, pricing, processes and compilations of information, information concerning customers or vendors, including vendor and customer lists, sales materials, and information regarding methods of doing business.

(3)    data concerning historic and current research and development, including but not limited to, designs of experiments, and the results of unsuccessful designs and experiments;

(4)    computer software, databases (*e.g.* databases containing technical job histories) and related documentation;

(5)    contractual rights, to the extent they are assignable;

(6)     all authorizations, permits, licenses, registrations, or other forms of permission, consent, or authority issued, granted, or otherwise made available by or under the authority of any governmental authority; and

(7)     Intellectual Property Rights.

Q.     "Intellectual Property Rights" means information, designs, creations, inventions, and other intangible property for which exclusive rights are recognized, including but not limited to, patents or patent applications, licenses and sublicenses, copyrights, trademarks, trade secrets, trade names, service marks, and service names.

R.     "The License-Back Period" means the six (6) month period following Defendants' completion of the divestitures required by this Final Judgment, during which the Defendants are granted a license to use Champion Deepwater Gulf Production Chemicals with Intellectual Property Rights that have been transferred or licensed to the Acquirer.

S.     "Permian" means Permian Mud Service, Inc., a Texas corporation with its headquarters in Houston, Texas, its successors and assigns, and its subsidiaries (including Champion Technologies, Inc.), divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

T.     "Production Chemicals" means the blends of chemical intermediates and solvents that are introduced to the wellbore, topside equipment, umbilicals, flowlines or other well infrastructure of an oil or gas well to facilitate the production or flow of hydrocarbons from the wellbore to the topside equipment, protect the well's infrastructure and equipment, remove hazardous or undesirable elements from the hydrocarbons or produced water, and facilitate the separation of oil, gas, and water in the topside equipment.

6

U.    "PCMS" means the provision of production chemical management services, including but not limited to product selection or design, front-end engineering design assistance, manufacture or blending of production chemicals, application of chemicals, or monitoring and testing of well conditions and product efficacy.

V.    "Relevant Employees" means all Champion employees whose job responsibilities at any time between January 1, 2012 and the closing of the Transaction related to the provision of Deepwater Gulf PCMS.

W.    "Transaction" means Ecolab's acquisition of Permian described in the "Agreement and Plan of Merger" between Ecolab,Permian, OFC Technologies Corp., and John W. Johnson, Steven J. Lindley, and J. Loren Ross, solely in their capacity as the Representatives, dated October 11, 2012, as amended.

X.    "Tangible Asset" means any physical asset (excluding real property), including but not limited to:

(1)    all machinery, equipment, hardware, spare parts, tools, fixtures, business machines, computer hardware, other information technology assets, furniture, laboratories, supplies, and materials, including but not limited to testing equipment, injection equipment, monitoring equipment, and storage vessels;

(2)    improvements, fixed assets, and fixtures pertaining to the real property identified as a Divestiture Asset;

(3)    all inventories, raw materials, work-in-process, finished goods, supplies, stock, parts, packaging materials and other accessories related thereto; and

(4)    business records including financial records, accounting and credit records, tax records, governmental licenses and permits, bid records, customer lists, customer

7

contracts, supplier contracts, service agreements; operations records including vessel logs, treatment logs, calendars, and schedules; job records, research and development records, health, environment and safety records, repair and performance records, training records, and all manuals and technical information Defendants provide to their own employees, customers, suppliers, agents or licensees.

## III.  APPLICABILITY

This Final Judgment applies to Defendants Ecolab and Permian, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

## IV.  DIVESTITURES

A.      Defendants are ordered and directed, within ten (10) calendar days after the Court signs the Hold Separate Stipulation and Order in this matter, to divest the Divestiture Assets to the Acquirer in a manner consistent with this Final Judgment.  Defendants shall use their best efforts to accomplish the divestitures ordered by this Final Judgment as expeditiously as possible. The United States, in its sole discretion, may extend the time period for any divestiture for an additional period of time not to exceed sixty (60) days.

B.      Defendants shall offer to furnish to the Acquirer, subject to customary confidentiality assurances, all information and documents relating to the Divestiture Assets customarily provided in a due diligence process except such information or documents subject to the attorney-client privileges or work-product doctrine.  Defendants shall make available such information to the United States at the same time that such information is made available to the Acquirer.  Any questions that arise during the due diligence process concerning whether particular assets are appropriately considered Divestiture Assets subject to this Final Judgment

shall be resolved by the United States, in its sole discretion, consistent with the terms of this Final Judgment.

  C. Defendants shall permit the Acquirer of the Divestiture Assets to have reasonable access to personnel and to make inspections of the physical facilities of the Divestiture Assets; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

  D. Defendants shall warrant to the Acquirer that each asset will be operational on the date of sale. Defendants shall maintain and enforce all intellectual property rights licensed to the Acquirer and maintain and protect all trade secrets and confidential information furnished to the Acquirer pursuant to the proposed Final Judgment.

  E. Defendants shall not take any action that will impede in any way the permitting, operation, use, or divestiture of the Divestiture Assets.

  F. Defendants shall warrant to the Acquirer that there are no material defects in the environmental, zoning or other permits pertaining to the operation of each asset, and that following the sale of the Divestiture Assets, Defendants will not undertake, directly or indirectly, any challenges to the environmental, zoning, or other permits relating to the operation of the Divestiture Assets.

  G. At the option of the Acquirer, the Defendants shall enter into a supply agreement, toll manufacturing, or toll blending agreement with the Acquirer to manufacture, blend or supply, any Champion Deepwater Gulf Production Chemical or component(s) thereof for a period of up to one (1) year, which may be extended by the United States, in its sole discretion, for an additional period of time not to exceed one (1) year. The Defendants shall manufacture

and blend the Champion Deepwater Gulf Production Chemicals or chemical intermediates using the manufacturing, blending and quality assurance procedures used by Champion directly preceding the Divestiture unless the Acquirer authorizes a change. The Defendants shall also procure the raw materials or intermediates used to make the Champion Deepwater Gulf Production Chemicals from the same source used by Champion directly preceding the Divestiture unless the Acquirer authorizes a change.   For each year of the tolling agreement, the Defendants shall supply up to 120% of the volume of Champion Deepwater Gulf Production Chemicals sold in the Deepwater Gulf in the prior year. The terms and conditions of such agreement shall be commercially reasonable and shall be subject to the approval of the United States, in its sole discretion.

      H.    At the option of the Defendants, the Acquirer shall enter into an agreement to provide the Defendants with:

      (1)    Non-exclusive, non-transferable fully paid-up licenses to provide any Champion Deepwater Production Chemical to Champion Deepwater Gulf PCMS Customers, for use in the Deepwater Gulf during the License-Back Period. Such licenses will be for the sole purpose of enabling the Defendants to continue providing those chemicals to a Champion Deepwater Gulf Customer during the License-Back Period.  The United States, in its sole discretion, may agree to an extension of the License-Back Period with respect to a particular customer for an additional period not to exceed six (6) months upon a showing of good cause, during which time the Defendants will retain the license to provide Champion Deepwater Production Chemicals to that particular Champion Deepwater Gulf PCMS Customer. The extension of this period with respect to a particular Champion Deepwater Gulf PCMS Customer

does not alter the License-Back Period applicable to other Champion Deepwater Gulf PCMS

Customers; and

      (2)      A perpetual, non-exclusive, non-transferable, fully paid-up license to

make, have made, use, or sell HI43 outside the Deepwater Gulf.  The terms and conditions of

any contractual arrangement intended to satisfy this provision must be reasonably related to

market conditions for such licenses.  Such license may, at the Acquirer's discretion, require the

Defendants to grant back to the Acquirer any modifications or improvements made by the

Defendants to HI43.

      I.      The Defendants shall use their best efforts to assign, subcontract, or otherwise

transfer to the Acquirer any (i) contract to provide PCMS in the Deepwater Gulf, or (ii) portion

of a Master Service Agreement or global agreement, including Call-off Agreements, between

Champion and a Champion Deepwater Gulf PCMS Customer relating to the provision of

Champion Deepwater Gulf PCMS in the Deepwater Gulf.  To this end, the Defendants shall

notify each Champion Deepwater Gulf PCMS Customer of the terms of this Final Judgment;

release the Champion Deepwater Gulf PCMS Customer of any notice requirements or

obligations that require the customer to use Champion's services or refrain from using another

supplier's services with respect to any Deepwater Gulf assets; introduce the Acquirer to each

Customer, request each Customer's consent to assign that Customer's contract to the Acquirer;

and specifically inform each such Customer that the Defendants' rights to the divested Champion

Deepwater Gulf Production Chemicals, in Deepwater Gulf, expire after six (6) months. The

Defendants shall not encourage any Champion Deepwater Gulf Customer to request an extension

of the License-Back Period.

J.      At the option of the Acquirer, Defendants shall enter into a transition services agreement with that Acquirer sufficient to meet the Acquirer's needs for assistance in matters relating to the design, manufacture, formulation, testing, provision, or application of Production Chemicals and related services to any Champion Deepwater Gulf Customer for a period of up to three (3) months. The Acquirer may exercise this option during the License-Back Period and for three (3) months thereafter.  The Defendant must make the personnel providing the transition services available during normal business hours. The terms and conditions of any contractual arrangement intended to satisfy this provision must be reasonably related to the market value of the expertise of the personnel providing any needed assistance.

K.      For a period of two (2) years following completion of the divestitures required by this Final Judgment, Defendants shall not, directly or indirectly, assign any Customer-Facing Relevant Employee to provide PCMS in the Deepwater Gulf to a Champion Deepwater Gulf PCMS Customer at a Deepwater Gulf Well or Platform for which the employee provided PCMS, directly or indirectly, while employed by Champion, except in connection with services provided to a Champion Deepwater Gulf PCMS Customer during the applicable License-Back Period for that customer.

L.      Unless the United States otherwise consents in writing, the divestiture pursuant to Section IV, or by trustee appointed pursuant to Section VI, of this Final Judgment, shall include the entire Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Assets can and will be used by the Acquirer as part of a viable, ongoing business engaged in the provision of PCMS for oil and gas wells located in the Deepwater Gulf, and that such divestiture will remedy the competitive harm

12

alleged in the Complaint.  The divestiture, whether pursuant to Section IV or Section VI of this Final Judgment,

(1)    shall be made to an acquirer that, in the United States' sole judgment, has the intent and capability (including the necessary managerial, operational, technical and financial capability) of competing effectively in the business of providing PCMS for oil and gas wells in the Deepwater Gulf; and

(2)    shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between an acquirer and Defendants give Defendants the ability unreasonably to raise the acquirer's costs, to lower the acquirer's efficiency, or otherwise to interfere in the ability of the acquirer to compete effectively.

## V.  RIGHT TO HIRE

A.    The Acquirer shall have the right to hire Relevant Employees while the License-Back Period is in effect with respect to any Champion Deepwater Gulf PCMS Customer. To enable the Acquirer to make offers of employment, Defendants shall provide the Acquirer and the United States with organization charts and information relating to Relevant Employees, including name, job title, past experience relating to development, production, sale or administration of Production Chemicals for use in oil or gas wells in the Deepwater Gulf, responsibilities, training and educational history, relevant certifications, and, to the extent permissible by law, job performance evaluations, and current salary and benefits information.

B.    Upon request, Defendants shall make the Relevant Employees available for interviews with the Acquirer during normal business hours at a mutually agreeable location and will not interfere with any negotiations by the Acquirer to employ the Relevant Employees. Interference with respect to this paragraph includes, but is not limited to, offering to increase the

salary or benefits of Relevant Employees other than as a part of a company-wide increase in salary or benefits granted in the ordinary course of business.

C.      For Relevant Employees who elect employment by the Acquirer, Defendants shall waive all non-compete agreements and all nondisclosure agreements, except as specified below, vest all unvested pension and other equity rights, and provide all benefits to which the Relevant Employees would generally be provided if transferred to a buyer of an ongoing business. For a period of twelve (12) months after the Acquirer's right to hire expires, the Defendants shall not solicit to hire, or hire, any Relevant Employee hired by the Acquirer, unless (1) such individual is terminated or laid off by the Acquirer or (2) the Acquirer agrees in writing that Defendants may solicit or hire that individual.

D.      Nothing in this Section shall prohibit Defendants from maintaining any reasonable restrictions on the disclosure by an employee who accepts an offer of employment with the Acquirer of the Defendants' proprietary non-public information that is (1) not otherwise required to be disclosed by this Final Judgment and (2) unrelated to the Divestiture Assets.

## VI. APPOINTMENT OF TRUSTEE

A.      If the Defendants have not divested the Divestiture Assets within the time period specified in Section IV(A), Defendants shall notify the United States of that fact in writing. Upon application of the United States, the Court shall appoint a trustee selected by the United States and approved by the Court to effect the divestiture of the Divestiture Assets.

B.      After the appointment of a trustee becomes effective, only the trustee shall have the right to sell the Divestiture Assets. The trustee shall have the power and authority to accomplish the divestitures to acquirers acceptable to the United States at such price and on such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions of

Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court deems appropriate. Subject to Section VI(D) of this Final Judgment, the trustee may hire at the cost and expense of the Defendants any investment bankers, attorneys, or other agents, who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the divestitures.

C.      Defendants shall not object to sales by the trustee on any ground other than the trustee's malfeasance. Any such objections by Defendants must be conveyed in writing to the United States and the trustee within ten calendar days after the trustee has provided the notice required under Section VII.

D.      The trustee shall serve at the cost and expense of Defendants, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to Defendants and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Divestiture and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestitures and the speed with which it is accomplished, but timeliness is paramount.

E.      Defendants shall use their best efforts to assist the trustee in accomplishing the required divestitures. The Defendants' failure to comply with Section IV(A) does not relieve the Defendants of their obligations to comply with the remainder of the terms in this Final Judgment. If a trustee is appointed, the acquirer procured by the trustee shall be deemed the Acquirer

referenced in this Final Judgment. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, and Defendants shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information. Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestitures.

F.      After its appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the divestitures ordered under this Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Divestiture Assets.

G.      If the trustee has not accomplished the divestitures ordered under this Final Judgment within six (6) months after its appointment, the trustee shall promptly file with the Court a report setting forth: (i) the trustee's efforts to accomplish the required divestitures; (ii) the reasons, in the trustee's judgment, why the required divestitures have not been accomplished; and (iii) the trustee's recommendations. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States, which shall have the right

16

to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

## VII.  NOTICE OF PROPOSED DIVESTITURES

A.      Within two (2) business days following execution of a definitive contract for sale of any of the Divestiture Assets, Defendants or the trustee, whichever is then responsible for effecting the divestiture required herein, shall notify the United States of any proposed divestiture required by Sections IV or VI of this Final Judgment, and submit to the United States a copy of the proposed contract for sale and any other agreements with the Acquirer relating to the Divestiture Assets.  If the trustee is responsible, it shall similarly notify Defendants.  The notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture Assets, together with full details of the same.

B.      Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from Defendants, the proposed Acquirer, any other third party, or the trustee, if applicable, additional information concerning the proposed divestiture, the proposed Acquirer, and any other potential Acquirers.  Defendants and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C.      Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States has been provided the additional information requested

17

from Defendants, the proposed Acquirer, any third party, and the trustee, whichever is later, the United States shall provide written notice to Defendants and the trustee, if there is one, stating whether or not it objects to the proposed divestiture, provided, however, that the United States may extend the period for its review up to an additional thirty (30) calendar days. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to Defendants' limited right to object to the sale under Section VI(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by Defendants under Section V(C), a divestiture proposed under Section V shall not be consummated unless approved by the Court.

## VIII.  FINANCING

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or VI of this Final Judgment.

## IX.  HOLD SEPARATE

Until the divestitures required by this Final Judgment have been accomplished, Defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by the Court. Defendants shall take no action that would jeopardize the divestiture ordered by the Court.

## X.  AFFIDAVITS

A.      Within fifteen (15) calendar days after the Court signs the Hold Separate Stipulation and Order in this matter, and every thirty (30) calendar days thereafter until the divestiture has been completed under Section IV or VI, Defendants shall deliver to the United States an affidavit as to the fact and manner of its compliance with Sections IV or VI of this

18

Final Judgment.  Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period.  Each such affidavit shall also include a description of the efforts Defendants have taken to solicit buyers for the Divestiture Assets and to provide required information to prospective Acquirers, including the limitations, if any, on such information.  Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by Defendants, including limitation on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B.      Within twenty (20) calendar days of the filing of the Complaint in this matter, Defendants shall deliver to the United States an affidavit that describes in reasonable detail all actions Defendants have taken and all steps Defendants have implemented on an ongoing basis to comply with Section IX of this Final Judgment. Defendants shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in Defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C.      Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestiture has been completed.

### XI. COMPLIANCE INSPECTION

A.      For the purposes of determining or securing compliance with this Final Judgment, or of any related orders such as any Hold Separate Stipulation and Order, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized

privilege, from time to time duly authorized representatives of the United States Department of Justice Antitrust Division, including consultants and other persons retained by the United States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Defendants, be permitted:

           (1)     Access during Defendants' office hours to inspect and copy, or at the option of the United States, to require Defendants to provide hard copy or electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Defendants, relating to any matters contained in this Final Judgment; and

           (2)     To interview, either informally or on the record, Defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

        B.     Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, Defendants shall submit written reports or responses to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

        C.     No information or documents obtained by the means provided in this Section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

        D.     If at the time information or documents are furnished by Defendants to the United States, Defendants represent and identify in writing the material in any such information or

documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States shall give Defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XII.  NO REACQUISITION

Defendants may not reacquire any of the Divestiture Assets during the term of this Final Judgment.

## XIII.  RETENTION OF JURISDICTION

This Court retains jurisdiction to enable any party to this Final Judgment to apply to the Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIV.  EXPIRATION OF FINAL JUDGMENT

Unless the Court grants an extension, this Final Judgment shall expire ten (10) years from the date of its entry.

## XV.  PUBLIC INTEREST DETERMINATION

The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States' responses to comments.  Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

21

Dated: 9/18/13

United States District Judge

22

**Schedule A**

| Material Description | Product Category |
|---|---|
| Defoamer V-149 | Anti-Foam Production Chemicals |
| Defoamer V-151 | Anti-Foam Production Chemicals |
| Defoamer V-159 | Anti-Foam Production Chemicals |
| Flotron M-239DW | Asphaltene Production Chemicals |
| Flotron M-267DW | Asphaltene Production Chemicals |
| Flotron PA-1000 | Asphaltene Production Chemicals |
| Flotron M-239 | Asphaltene Production Chemicals |
| Bactron K-103 | Biocides Production Chemicals |
| Bactron K-95 | Biocides Production Chemicals |
| Surfatron DQ-91 | Biocides Production Chemicals |
| RPA-102 | Boiler Water Process Additives |
| Capclean H-101DW | Capillary Cleaning Production Chemicals |
| Capclean H-102DW | Capillary Cleaning Production Chemicals |
| Capclean W-202DW | Capillary Cleaning Production Chemicals |
| Acetic Acid, Glacial | Commodity Production Chemicals |
| BC-215 | Commodity Production Chemicals |
| Toluene | Commodity Production Chemicals |
| Xylene | Commodity Production Chemicals |
| XyleneDW | Commodity Production Chemicals |
| Cortron HRU-100 | Corrosion Production Chemicals |
| Cortron R-228 | Corrosion Production Chemicals |
| Cortron R-856 | Corrosion Production Chemicals |
| Cortron RN-177 | Corrosion Production Chemicals |
| Cortron RN-261 | Corrosion Production Chemicals |
| Cortron RN-384 | Corrosion Production Chemicals |
| Cortron RN-406 | Corrosion Production Chemicals |
| Cortron RN-466 | Corrosion Production Chemicals |
| Cortron RN-488 | Corrosion Production Chemicals |
| Cortron RU-142 | Corrosion Production Chemicals |
| Cortron RN-261FB | Corrosion Production Chemicals |
| Cortron RN-466FB | Corrosion Production Chemicals |
| Cortron RN-488DW | Corrosion Production Chemicals |
| Cortron RN-488FB | Corrosion Production Chemicals |
| Emulsotron X-1021 | Demulsifiers Production Chemicals |

23

| | |
|---|---|
| Emulsotron X-1164 | Demulsifiers Production Chemicals |
| Emulsotron X-1329 | Demulsifiers Production Chemicals |
| Emulsotron X-1523 | Demulsifiers Production Chemicals |
| Emulsotron X-1523DW | Demulsifiers Production Chemicals |
| Emulsotron X-1665 | Demulsifiers Production Chemicals |
| Emulsotron X-1678 | Demulsifiers Production Chemicals |
| Emulsotron X-1808 | Demulsifiers Production Chemicals |
| Emulsotron X-203 | Demulsifiers Production Chemicals |
| Emulsotron X-316 | Demulsifiers Production Chemicals |
| Emulsotron X-421 | Demulsifiers Production Chemicals |
| Emulsotron X436B5 | Demulsifiers Production Chemicals |
| Emulsotron X-917 | Demulsifiers Production Chemicals |
| Emulsotron X-606 | Demulsifiers Production Chemicals |
| Emulsotron X-715 | Demulsifiers Production Chemicals |
| Emulsotron X-716 | Demulsifiers Production Chemicals |
| Emulsotron X-8292 | Demulsifiers Production Chemicals |
| Emulsotron X-942 | Demulsifiers Production Chemicals |
| FlowPlus DR-2000C | Flow Improvers Production Chemicals |
| Surfatron DQ-76 | General Surfactants Production Chemicals |
| Surfatron DQ-86 | General Surfactants Production Chemicals |
| Assure HI-43DW | Hydrate Production Chemicals |
| Assure HI-57DW | Hydrate Production Chemicals |
| Assure HI-81 | Hydrate Production Chemicals |
| Flexoil FM-230DW | Paraffin Production Chemicals |
| Flexoil FM-102DW | Paraffin Production Chemicals |
| Flexoil FM-192DW | Paraffin Production Chemicals |
| Flotron M-261DW | Paraffin Production Chemicals |
| Flotron M-55 | Paraffin Production Chemicals |
| Gyptron EGP-5015 | Scale Production Chemicals |
| Gyptron SA1110N | Scale Production Chemicals |
| Gyptron T-182 | Scale Production Chemicals |
| Gyptron T-255 | Scale Production Chemicals |
| Gyptron T-494 | Scale Production Chemicals |
| Gyptron T-94 | Scale Production Chemicals |
| Gyptron TA-13 | Scale Production Chemicals |
| Hydrochloric Acid, HCL, 15% | Scale Production Chemicals |
| Hydrochloric Acid, HCL, 5% | Scale Production Chemicals |
| Gyptron TA-21 | Scale Production Chemicals |

| Hydrochloric Acid | Scale Production Chemicals |
|---|---|
| Gas Treat 164 | Scavengers Production Chemicals |
| Gas Treat 164FB | Scavengers Production Chemicals |
| Gas Treat 164FBC | Scavengers Production Chemicals |
| Cleartron HZB-48 | Water Clarifier Production Chemicals |
| Cleartron HZB-49 | Water Clarifier Production Chemicals |
| Cleartron PZ-20000 | Water Clarifier Production Chemicals |
| Cleartron ZB-103 | Water Clarifier Production Chemicals |
| Cleartron ZB-165 | Water Clarifier Production Chemicals |
| Cleartron ZB-167 | Water Clarifier Production Chemicals |
| Cleartron ZB-258 | Water Clarifier Production Chemicals |
| Cleartron ZB-279 | Water Clarifier Production Chemicals |
| Cleartron ZB-307 | Water Clarifier Production Chemicals |
| Cleartron ZB-374 | Water Clarifier Production Chemicals |
| Cleartron ZB-45 | Water Clarifier Production Chemicals |
| Cleartron ZB-543 | Water Clarifier Production Chemicals |
| Cleartron PZ-15000FB | Water Clarifier Production Chemicals |
| Cleartron ZB-582 | Water Clarifier Production Chemicals |
| Cleartron ZB-83 | Water Clarifier Production Chemicals |

**Schedule B**

| Equipment Name | General Purpose |
|---|---|
| Densitometer | Product density |
| FTIR | General product fingerprinting |
| Brookfield viscometer | Product viscosity |
| NVR analyzer | Product activity measurement |
| Particle size analyzer | Particle size for deepwater products |
| Shaker for particle testing | Homogenizing |
| pH meter | pH measurement |
| Hot bath, cold bath | General purpose |
| Refrigerator | General purpose |
| KF titrator | Water content analyzer |
| Centrifuge | General purpose |
| UV-Vis | General purpose for water analysis |
| DSC | Was appearance temperature for an oil |
| HTGC | Was content and wax distribution of an oil |
| ICP | Water analysis, cations |
| IC | Water analysis, anions |
| AA | Water analysis (obsolete with ICP) |
| Balance | Various top loader and analysis balances |
| Cold finger | Wax inhibitor screening |

| | |
|---|---|
| Turbiscan | Asphaltene inhibitor screening |
| Hot bath, cold bath, hot plate | Pour point testing, scale bottle testing, phase sep bottle testing, compatibility |
| Bottle shaker | For shaking bottles |
| Incubator | For bacteria bug bottles |
| ATP meter | Bacteria rapid screen test |
| IR Meter | Oil in water measurements |
| Top stirred autoclave for AAHI testing (5000 psi) | Low pressure hydrate autoclave |
| High pressure long term static stability test | Long term high pressure stability testing, built for one customer |
| Refrigerated centrifuge | Accelerates the product aging process by adding centrifugal force |
| Iotrascan | Saturate, aromatic, resins, and asphaltene analysis |
| Hydrate Rocking Cell (5000 psi) | Standard hydrate rocking cell |
| Defoamer test at pressurized conditions | Oil can be mixed with gas and depressurized to ambient conditions |